CIA. AZUCARERA DEL TOA, INC., Petitioner, *v.* TAX COURT OF PUERTO RICO, Respondent; TREASURER OF PUERTO RICO, Intervener.

No. 250. Argued June 7, 1951.—Decided December 20, 1951.

*Diego Guerrero Noble* for petitioner. *Víctor Gutiérrez Franqui, Attorney General (Vicente Géigel Polanco, former Attorney General* on the brief) and *J. C. Santiago Matos* and *J. E. Fernández Badillo, Assistant Attorneys General,* for intervener, respondent in the main action.

MR. CHIEF JUSTICE TODD, JR., delivered the opinion of the Court.

In April and July 1941, the Treasurer of Puerto Rico sent petitioner herein notices of income tax deficiencies, plus interest and penalties, for the years 1935, 1937, 1938 and 1939, amounting to $12,321.15, $6,718.24, $27,834.67 and $5,339.79, respectively. He also determined that for the year which ended June 30, 1936, the petitioner was entitled to a refund amounting to $250.20. However, no credit was allowed nor refund made because, as the Treasurer claimed, the four-year period provided by § 64 (*b*) of the Income Tax Act had elapsed, from the date of the payment, on March 3, 1937.

On May 7, 1941, the taxpayer petitioned the Treasurer, through Gonzalo Aponte, a certified public accountant, for an administrative hearing to discuss the 1935 deficiency. On July 16, 1941, also represented by Gonzalo Aponte, it re-

quested an administrative hearing to discuss the deficiencies corresponding to the other taxable years.

The petitioner requested said administrative hearings in a form supplied by the Treasury Department, the penultimate paragraph of which contained the following: "I make it known that I expressly waive the period of prescription in this case . . ."

Said forms or applications appear sworn and subscribed to by Gonzalo Aponte himself before an official of the Income Tax Bureau of the Treasury Department. Because of the question of prescription raised, it is advisable to review the administrative procedure followed in this case.

The Treasurer set October 1, 1941, for the administrative hearing to discuss the deficiencies notified, but on September 23, 1941, Gonzalo Aponte moved for a continuance to the second fortnight in November. The Treasurer agreed and set the hearing for November 5, 1941. On October 28, 1941, the taxpayer requested another continuance and the Treasurer agreed and reset the hearing for November 26, 1941.

On November 17, 1941, José H. Belaval, an accountant in Gonzalo Aponte's office, applied for a new postponement of the administrative hearing, which was set for January 9, 1942. Nevertheless, on January 14, 1942, the Treasurer made a new setting and fixed the 29th of that same year, on which date the hearing was held.

On December 22, 1942, Gonzalo Aponte addressed the Treasurer praying for disposition of the case and thereafter the taxpayer twice wrote to the Treasurer making the same request.

It was not until July 12, 1944, more than two years later, that the Treasurer notified the taxpayer of the outcome of the administrative hearing held on January 29, 1942. A reduction of the taxable income for all the years in controversy was determined.

On July 28, 1944, the taxpayer prayed for reconsideration of the order entered on July 12 of that same year and on August 4, 1944, the Treasurer agreed thereto and on September 20, 1944, the hearing on reconsideration took place.

On April 24, 1945, the taxpayer wrote to the Treasurer praying that the case be decided as soon as possible and on December 27, 1945, the taxpayer, through accountant Gonzalo Aponte, calls the Treasurer's attention to the fact that, in connection with the deficiencies for the years 1935, 1937 and 1938, "the term allowed under § 60 (a) (1) of the Income Tax Act, No. 74 of 1924, as amended, to assess . . . taxes in these cases, expired in September 1942, 1944 and 1945, respectively, wherefore, pursuant to the decision of the Tax Court of Puerto Rico in the case of Sucn. José Rexach, we pray that said Department order the final cancellation of the deficiencies for the years 1935, 1937 and 1938."

Again on January 27, 1947, petitioner herein wrote a letter to the Treasurer reminding him that the hearing of September 20, 1944, on reconsideration, had been held more than two years ago and prayed for a decision.

It was not until February 6, 1948, that the Treasurer passed upon the motion for reconsideration and again lowered the total amount of petitioner's net income, especially in the 1938 deficiency, where the reduction was greater, namely, from $257,818.43 as the net income originally calculated, to $89,136.56 which amount represented the net taxable income, according to the decision of February 6, 1948. The new deficiencies, interest and penalties notified amounted to $14,376.46 for the year 1935; $171.03 for the year 1937; $73.06 for the year 1938, and $2,647.55 for the year 1939. A tax overpayment for the year 1936 was determined in $1,081.99, which could neither be refunded nor credited for the above-stated reason. It was from the aforesaid decision of February 6, 1948, that the taxpayer appealed on February 12, 1948, to the Tax Court.

It alleged in the complaint:

(a) That the Treasurer had permitted the seven-year period to assess the tax to elapse—§ 60 (a) (1) of the Income Tax Act.

(b) That since the Treasurer had voluntarily declared a refund in its favor for the year 1936 the said refund was not barred since the four-year period started to run from the date that the respondent served notice of his final decision of February 6, 1948.

(c) That if the plea of prescription were decided against it, there would result then, because of the amount to be refunded for the year 1936, a reduction in the 1935 deficiency, pursuant to the theory of recoupment.

(d) That the Treasurer unduly increased the 1939 income, as to the amount of $11,390.46 which, according to the taxpayer, was a reduction in the inventory of excess sugar, made in order to adjust its sugar inventory at the net market value on June 30, 1939.

The Treasurer answered the complaint accepting some of the essential facts and denying others, alleging also that he did not make a jeopardy assessment because he was induced by petitioner's action in expressly waiving the statute of limitations when requesting for an administrative hearing.

The Tax Court dismissed the plea of prescription holding that the petitioner had waived same and decided furthermore that it was not entitled to a refund or to invoke the doctrine of recoupment and, as to the amount of $11,390.46 as an alleged loss in the adjustment of the 1939 sugar inventory, that such loss had not been proved.

We granted certiorari in this case to review the decision of the Tax Court.

The petitioner contends that the lower court erred in deciding the four questions involved here. We shall consider and dispose of them in the same order they were raised.

I

■ With regard to prescription, subdivision (*b*) of § 61 of the Income Tax Act provides as follows: "Where both the Treasurer and the taxpayer have consented in writing to the assessment of the tax after the time prescribed in Section 60 for its assessment the tax may be assessed at any time prior to the expiration of the period agreed upon."

Section 60 (*a*) (1) provides:

"Section 60 (*a*).—Except as provided in Section 61 and in subdivision (*c*) of Section 57 and in subdivision (*b*) of Section 62:

"(1) The income tax levied by this Act shall be assessed within seven (7) years after the return was filed, and no judicial proceeding for the collection of such taxes shall be begun after the expiration of said period."

Petitioner argues that the signing and swearing of the documents praying for administrative hearings, notwithstanding they contain the phrase: "I make it known that I expressly waive the period of prescription in this case," did not constitute the agreement on the waiver of prescription provided by § 61 (*b*), *supra*, because the alleged waiver: (1) is ambiguous, confusing and uncertain; (2) it has no fixed term for expiration nor does it state which prescriptive term is being waived, and (3) it is not signed by the Treasurer for it is sworn by the taxpayer alone.

In regard to this question we have held that even in the absence of the waiver of prescription to which § 61 (*b*), *supra*, refers, the period of prescription may be understood to have been extended if the taxpayer's own acts in requesting extensions and making promises to pay which he did not keep, causes the Treasurer who relied on said promises, to allow the statutory period to expire. *Sucrs. de J. González & Co.* v. *Buscaglia, Treas.*, 63 P.RR. 243. And in *Buscaglia, Treas.* v. *Tax Court*, 67 P.R.R. 650, applying § 61 (*b*), we construed the scope of several clauses of a contract of

waiver of the period of prescription when the taxpayer was urged by the Treasurer to sign it as a condition to the granting of an administrative hearing and we decided that if the taxpayer limits his waiver to a determined period and the Treasurer accepts it in the limited manner, he is bound thereby. Subsequently, in *Sucrs. de Sobrino & Cía.* v. *Tax Court*, 68 P.R.R. 809, 812-3, in view of the result reached as to the lack of a cause of action in favor of the taxpayer, we did not stop to consider whether it waived the statute of limitations upon petitioning for reconsideration of a notice of deficiency and for an administrative hearing in a document containing the same statement in issue here.

Even though presumably we could dispose of the question of prescription on the basis of the doctrine of disability laid down in *Sucrs. de J. González & Co.* v. *Buscaglia, Treas.*, *supra*, we would rather consider on the merits the various questions raised by the petitioner challenging the validity of its waiver of the statute of limitations.

In regard to a provision in Federal Income Tax Acts similar to that contained in § 61(*b*), *supra*, it has been decided that said waiver is not a contract nor need it be drafted with the formalities of one or in any particular form. *Florsheim Bros. Co.* v. *United States*, 280 U. S. 453; *Stange* v. *United States*, 282 U. S. 270; *Sabin* v. *United States*, 44 F. 2d 70 (C.C.A., 1930); *Shambaugh* v. *Scofield*, 132 F. 2d 345 (C.C.A. 5, 1943); *United States* v. *Gayne*, 137 F. 2d 522 (C.C.A. 2, 1943); 10 Mertens, Law of Federal Income Taxation 224, § 57.47; 232, § 57.53.

■ We can not agree with the petitioner that its waiver is ambiguous, confusing and uncertain because in the phrase "I make it known that I expressly waive the period of prescription in this case" it is not stated to which prescriptive period the taxpayer was referring. In petitioning for reconsideration of its income tax deficiencies and for an administrative hearing it is obvious that it could only have

been referring to the statute of limitations of § 60 (a) (1), *supra.*

▉▉▉▉ The petitioner claims that the waiver is void because the period within which the tax had to be assessed was not fixed as required by § 61 (b) in providing that the tax could be assessed at any time "prior to the expiration of the period agreed upon." It is true that, as happened in *Buscaglia* v. *Tax Court, supra,* the parties may fix in writing the terms and conditions under which the taxpayer executes the waiver and the Treasurer accepts it. However, this does not mean that the failure to fix said term renders the waiver ineffective. It has been held that in that event the prescriptive term is considered extended (1) for a reasonable time, or (2) until it is terminated by either party on reasonable notice. What constitutes reasonable time depends on the facts of each particular case. As stated by Mertens, *op. cit.,* p. 225: ". . . The principal question is whether under all the circumstances the government acted within a reasonable time. Where the taxpayer by petitions, appeals, claims for credit or abatement and requests for rehearings, and by attacks on the validity of the waivers, has delayed the actual assessment or collection of the tax (the Commissioner properly awaiting the outcome of the litigation), the taxpayer may not say that an unreasonable time has expired. This principle is being extensively applied; only slight evidence has been required of activity by the taxpayer to hold up assessment and collection of the tax to justify a substantial time limitation on the expiration of an unlimited waiver."

This doctrine is upheld, among others, in *Greylock Mills* v. *White,* 63 F. 2d 866 (C.C.A. 1, 1933), cert. denied in 289 U. S. 760; *Brampton Woolen Co.* v. *Field,* 56 F. 2d 23 (C.C.A. 1, 1932), cert. denied in 287 U. S. 608; *Simmons* v. *Westover,* 76 F. Supp. 442, 172 F. 2d 556 (C. A. 9, 1949); *Big Four Oil & Gas Co.* v. *Heiner,* 57 F. 2d 29 (C.C.A. 3, 1932); *Greylock Mills* v. *Commissioner of Internal Revenue,* 31 F. 2d

655 (C.C.A. 2, 1929), cert. denied in 280 U. S. 566, and in innumerable cases decided by the United States Board of Tax Appeals, especially in the case of *Nathan Loeser*, 27 B.T.A. 601 (six years elapsed from the date the unlimited waiver was signed until the tax was assessed) and others therein cited.

██ Pursuant to the facts of the instant case as previously set forth, it has been proved that the petitioner moved for several postponements of the first administrative hearing granted; that after the first reconsideration of the deficiencies was disposed of, the petitioner insisted, seeking a new reconsideration and the Treasurer agreed to grant another hearing, which in fact took place on September 20, 1944. Up to that time the petitioner can hardly prevail upon us to decide that the time which elapsed since May and July 1941 when it signed the unlimited waivers may not be considered reasonable.

Now, may the time taken by the Treasurer to enter his second decision on reconsideration on February 6, 1948, be considered unreasonable? We hold that it can not. Petitioner itself, in the letter it addressed to the Treasurer on January 27, 1947, urging disposition of the case, stated that "We realize the volume of work handled by that Bureau . . .", to which the Treasurer replied informing it that the case "is still pending because certain information requested from the office of the Attorney General of Puerto Rico has not been received."

It was not a common and simple case but rather one in which the gross income and general deductions declared by the petitioner for each taxable year exceeded by far a million dollars. The fact that the Treasurer granted two administrative hearings on reconsideration and as a result thereof twice reduced the amount of the deficiencies to be paid by the petitioner, can not be regarded either as prejudicial to the taxpayer, despite the fact that for one of the years involved,

1935, the deficiency was somewhat higher because of interest and penalties.

■ As stated in *Big Four Oil & Gas Co.* v. *Heiner, supra;* "the interval of three years during which the appellant's claim for credit was being considered is long, but not unreasonable, when caused by the taxpayer, in view of the mass of other claims and returns demanding the attention of the Commissioner." Said case applied and adopted the rule laid down in *Greylock Mills* v. *Commissioner of Internal Revenue, supra,* to the effect that "If waivers which are in terms unlimited are to be limited at all, we think they should expire only after the taxpayer gives notice to the Commissioner that he will regard the waiver as at an end after a reasonable time, say three or four months, from the date of such notice. In such a rule there is no harshness to either party; on the contrary, it seems to us the most reasonable one."

■ Can it be considered that petitioner's letter to the Treasurer dated December 27, 1945, calling his attention to the fact that as to the 1935, 1937 and 1938 deficiencies the term allowed by § 60 (a) (1), *supra,* had expired, served to terminate its unlimited waiver of the statute of limitations? We do not think so, inasmuch as when it executed its waiver in 1941, it knew that the statutory period would expire and precisely executed an unlimited waiver of said term. If petitioner's contention were to prevail, it would be tantamount to holding that it did not waive at all said term. This is untenable.

■ Let us now consider petitioner's last challenge to its unlimited waiver of prescription. It argues that the same is void because it was not signed by the Treasurer, insinuating thereby that it was not approved by said official.

The decisions are divided as to whether a waiver of prescription which has not been approved in writing by the Federal Commissioner of Internal Revenue (the Treasurer here) is valid. 1951 Fed. Tax Service, Prentice Hall, vol. 2,

§ 19,391, p. 19,343; 10 Mertens, *op. cit.*, § 57.69, p. 246. Even though the Court of Appeals for the First Circuit is among those courts which have refused to recognize the validity of a waiver not approved in writing by the Commissioner—*United States* v. *Bertelsen & Petersen E. Co.*, 95 F. 2d 867 (C.C.A. 1, 1938) ; *S. S. Pierce Co.* v. *U. S.*, 93 F. 2d 599 (C.C.A. 1, 1937)—since the question raised is one of construction of a local statute, no matter that ours be similar to the Federal statute, we are not bound to follow that court's interpretation of the latter, notwithstanding that its reasonings might be persuasive. See *People* v. *Mantilla*, 71 P.R.R. 35, 48, footnote 11. However, in the instant case they are not, for they merely apply strictly the words of the statute without taking into consideration, as done by other courts, the action of the parties and especially of the Commissioner, who took into account the waiver signed by the taxpayer, treating the case as one in which the period of prescription has been in fact waived and postponing the tax assessment because the Commissioner (the Treasurer here) granted hearings and reconsiderations based on said waiver. For example, in *Shambaugh* v. *Scofield, supra*, the Court of Appeals for the Fifth Circuit, after referring to the decision of the United States Supreme Court in the sense that a waiver of this nature is not a contract and that the provision requiring the Commissioner's approval was inserted for purely administrative purposes and not to convert into a contract what is essentially a voluntary, unilateral waiver of a defense by the taxpayer—*Stange* v. *United States, supra; Florsheim Bros. Co.* v. *United States, supra,*—remarked as follows at page 347:

"The taxpayers intended, and all parties understood, that the waivers were submitted in aid, and as a part of, the taxpayers' efforts to effect a compromise adjustment of the tax, and that the purpose of the waivers was to suspend the running of the statute while the offers were under consideration. It was certainly not contemplated that while the taxpayers

negotiated to better their position the statute should continue to run, so that even though the compromise offers were rejected collection of the tax would be barred by limitation."

It was decided in said case that the letters of the Commissioner rejecting the compromise offers contained in the waivers, "relate to, and are to be considered in connection with, the offers which contained the waivers. They constitute presumptive proof of the Commissioner's agreement to the waivers, unless overcome by countervailing evidence, which is here lacking. Had the Commissioner formally signed the waivers themselves, the taxpayers could have gained nothing more. Having had full advantage of the waivers, the taxpayers should not now be heard to repudiate them unless they were clearly inoperative. . . ." The Court of Appeals for the Ninth Circuit has made similar pronouncements in *Commissioner of Internal Revenue* v. *Hind*, 52 F. 2d 1075 (1931) and *McCarthy Co.* v. *Commissioner of Internal Revenue*, 80 F. 2d 618 (1935), and it should be noted that the Supreme Court, in the latter case, denied certiorari in 298 U. S. 655, that is, subsequent to its decision in the cases of Stange and Florsheim, *supra*. Mertens, *op. cit.*, p. 248, says that "While the Supreme Court has not passed directly on the validity of unsigned waivers, [by the Commissioner], it has sustained a waiver signed by the Commissioner during the pendency of an appeal before the Board of Tax Appeals," citing *Burnet* v. *Railway Equipment Co.*, 282 U. S. 295.

On the other hand, in *Stearns Co.* v. *United States*, 291 U. S. 54, it was held that the lack of the Commissioner's signature may be ignored when there is an abandonment of a privilege to insist upon the fulfillment of a condition and that when the taxpayer makes a positive request, which contains a waiver, until the latter is revoked within a reasonable time it has the effect of an estoppel which is, in the long run, what we held in *Sucrs. de J. González & Co.* v. *Buscaglia, Treas., supra*, p. 248, saying: "If the prescriptive term may

be extended by means of an agreement therefor, it may equally be understood to have been extended when, there being no such agreement the delay is caused by the acts of the taxpayer hereinbefore described. . . ."

And the taxpayer's acts herein in petitioning for reconsideration of the deficiencies and for an administrative hearing and, after a decision had been entered, in petitioning for reconsideration thereof and for a new hearing, which he was granted, coupled with the waiver of the statute of limitations which he signed and swore before an official of the Income Tax Bureau, rendered unnecessary, under the attendant circumstances, the Treasurer's signature to establish conclusively, throughout the entire administrative proceeding, his acquiescence to extend the term and to estop the taxpayer from repudiating its own actions and from attempting to avail itself of a privilege it waived.

## II

In the second assignment the petitioner asserts that since the Treasurer voluntarily declared and acknowledged a refund in its favor for 1936, he could not refuse it on the ground that the four-year period to claim said refund had expired when he acknowledged it, pursuant to § 64(b) of the Income Tax Act.[1]

The petitioner argues that § 64(b) is applicable only where the taxpayer declared by mistake a higher income than the one he should have legally declared and, consequently, made a tax overpayment, but that it is not applicable to a case like the one at bar in which the Treasurer himself

---

[1] Section 64(b) provides:

"Except as provided in subdivision (c) of this Section, (1) no such credit or refund shall be allowed or made after four years *from the time the tax was paid*, unless before the expiration of such four years a claim therefor is filed by the taxpayer, nor (2) shall the amount of the credit or refund exceed the portion of the tax paid during the four years immediately preceding the filing of the claim or, if no claim was filed, then during the four years immediately preceding the allowance of the credit or refund." (Italics ours.)

determined, in auditing its return, the excess paid by the taxpayer. This question was not raised in the Tax Court for in the complaint as well as at the hearing the taxpayer merely alleged and maintained that "the four-year period to claim [the refund] starts to run from the date the respondent served notice of his final decision of February 6, 1948, but said claim for refund would turn out to be unnecessary and academic since it was refused beforehand," and said court correctly decided that the starting point to count the four years is from the time the tax was paid, as expressly provided by § 64 (b), *supra*. See *González Padín Co.* v. *Tax Court*, 66 P.R.R. 909.

Since the question now raised for the first time was not raised in the lower court, we are unable to consider it. *Monge* v. *Tax Court*, 68 P.R.R. 594; *Atiles, Mgr.* v. *Industrial Commission*, 69 P.R.R. 812.

### III

The petitioner avers that if it was no longer entitled to the 1936 refund acknowledged by the Treasurer because the four years had elapsed, the Tax Court erred in not applying the doctrine of recoupment recognized in *González Padín Co.* v. *Tax Court*, *supra*, for the Treasurer's readjustment, which occasioned the 1936 overpayment, resulted in the 1935 deficiency.

The petitioner explains its contention thus:

"The Treasurer increased by $20,253.03 the value of the sugar inventory as of June 30, 1935, thus increasing the net income for said year, and assessed a higher tax than the one already paid. Since the inventory at the end of a year is the inventory at the beginning of the next, the Treasurer correctly reduced the taxpayer's net income in the following year, namely, 1936, by the same amount of $20,253.03, and determined a tax overpayment for 1936. That is, upon making the adjustment the Treasurer acknowledged and accepted that the 1935 tax deficiency and the 1936 tax overpayment arise out of the same

transaction or event, and his refusal to credit the 1936 over-payment against the 1935 deficiency, results in a double taxation of the same transaction."

The Tax Court held that the doctrine of recoupment, just ·as it was not applied in the *González Padín* case, *supra*, is not in point here for these reasons:

"The only fact in question which resulted in an overpay-ment in 1936 and a deficiency in 1935, was the change in the price of each ton of sugar in petitioner's warehouses at the close, on June 30, 1935, of its fiscal year. It is obvious that the Treasurer has been consistent, always maintaining the same attitude, and insisting, without any contradiction, with his orig-inal determination to the effect that the 20,052.5 tons of sugar involved were worth $3.01 per ton, instead of $2, which amount the petitioner had duly assigned to that product.

"The additional fact that the required change resulted in the 1936 overpayment and in an increase of the 1935 tax defi-ciency, was something that the Treasurer could not help, pur-suant to the law, at that time.

"It cannot be inferred from the facts in question that the defendant changed his original theory too late for the taxpayer to claim a refund, unless the Treasurer's inaction from the date that plaintiff voluntarily paid the tax until it was served with a tentative notice of deficiency, were characterized as the pros-ecution of 'a transaction or taxable event on one theory'. *Gon.- zález Padín Co.* v. *Tax Court, supra.* In all fairness we cannot reach such a conclusion."

We deem that the Tax Court committed the error assigned. The doctrine of recoupment recognized in the *González Padín, supra*, does not have, under the facts of the instant case, the limited scope ascribed thereto by said Court. If, as petitioner claims and the Treasurer admits, the in-crease by the latter of petitioner's sugar inventory on June 30, 1935, which resulted in a deficiency for that year, is the same inventory used by the Treasurer for 1936, which re-sulted in a decrease in petitioner's income for this last year and, therefore, a tax overpayment, the 1935 deficiency as well as the 1936 overpayment unquestionably arose out of the

same transaction and if recoupment were not applied the Treasurer would be inconsistently treating, on two different occasions, the same transaction.

We said in the *González Padín* case, p. 913, citing the decision in *Rothensies* v. *Electric Battery Co.*, 329 U. S. 296, that "It has never been thought to allow one transaction to be offset against another, but only to permit a transaction which is made subject of suit by a plaintiff to be examined in all its aspects, and judgment to be rendered that does justice in view of the one transaction as a whole." And we also noted in footnote 1, p. 914, that recoupment ". . . is founded on the equitable theory that all taxes and credits which arise *out of the same transaction—whether the taxes or credits are paid or obtained in the same or in different years*—should be adjusted without reference to the statute of limitations to prevent unjust enrichment for one party who is endeavoring to treat the same item inconsistently at different times." (Italics ours.)

The situation here is similar to that in *Crossett Lumber Co.* v. *United States*, 87 F. 2d 930 (C.C.A. 8, 1937), wherein, due to an error of the Commissioner in the taxpayer's 1926 inventory, the taxable income was decreased in that year but increased in 1927, and as a result thereof the Commissioner credited a certain sum to the taxpayer against a 1924 deficiency. The taxpayer claimed refund of the 1927 overpayment and the Government, alleging that the 1924 credit it allowed did not lie because of the error committed in the inventory, pleaded either estoppel or recoupment. The court decided that the former did not lie, but that the latter did, and stated at p. 933:

"In the case at bar one act, the erroneous valuation of the inventory of November 30, 1926, set in motion a course of events resulting in the erroneous refund to the taxpayer on one hand, and an overassessment in his favor on the other. Had the Government, within the time limited, brought an action to recover the refund, made erroneous by the inventory, the taxpayer could have set up by way of defense its overpayment

of income tax of the following year, induced by the same erroneous inventory. There is as direct connection in this case between income taxes *paid in successive years* based upon a single erroneous inventory as there was between the estate tax erroneously determined and income tax correctly determined on the same item in *Bull* v. *United States, supra.* That being the situation, it is immaterial that the parties are reversed and the taxpayer is bringing the suit. . . ." (Italics ours.)

The statement in *Bull* v. *United States,* 295 U. S. 247, 262, to the effect that "If the claim for income tax deficiency had been the subject of a suit, any counter demand for recoupment of the overpayment of estate tax could have been asserted by way of defense and credit obtained notwithstanding the statute of limitations had barred an independent suit against the Government therefor", is commented by McConnell, The Doctrine of Recoupment in Federal Taxation, 28 Va. L. Rev. 577, 587, saying: "This being true, the taxpayer, although nominally the plaintiff, was treated as if he were the defendant in an action by the United States to collect taxes."

Likewise, the taxpayer here, although plaintiff, may plead recoupment against the Treasurer. The latter's action modifying the amount of the 1935 sugar inventory, although not erroneous, served to produce a deficiency in the tax paid by the taxpayer for said year and at the same time its 1936 tax overpayment, which fact the Treasurer himself admitted. For the purposes of the application of the doctrine of recoupment, it was the same transaction. The petitioner is entitled, not to a favorable judgment for its 1936 overpayment, since as has been graphically stated in regard to recoupment, said doctrine is a shield, not a sword, but, since a single transaction which brought about the 1935 deficiency is involved, it is entitled to be protected against payment of that deficiency in the amount of the 1936 overpayment. Although in *González Padín, supra,* we reached a different conclusion, it was due to the fact that there the taxpayer's claim did not arise out of the same transaction.

## IV

 Finally, the petitioner contends that the Tax Court erred in rejecting the deduction claimed for 1939 as to an item of $11,390.46 which the Treasurer added to petitioner's income in that year.

According to the evidence presented it appears that on June 30, 1938, the petitioner had on hand 58,995 sacks of excess sugar having on that date an assessed market value of $6.991856 per sack. On that same date the petitioner opened a reserve fund amounting to $44,590.92 to cover selling and shipping charges of the aforesaid sugar. The fund was calculated at the rate of $0.755842 for selling and shipping charges per sack of sugar. On June 30, 1939, the taxpayer sold 8,536 of the 58,995 sugar sacks, leaving a remainder of 50,459 sacks of excess sugar on hand. The market price of sugar at that time was $6.75. Then the petitioner, instead of sticking to the reserve it had established, eliminated said system on June 30, 1939, and fixed the price per sack at $6.75 less 75¢ for selling and shipping charges, that is, it fixed $6 as net price. This set a value of $302,754 on the said 50,459 sacks. Since the value of those 50,459 sacks had been estimated on June 30, 1938, at the rate of 6.99 ($6.991856), that is, a total of $352,802.07, the taxpayer considered that it had sustained a loss in the amount of the difference, to wit, $50,048.07. It then declared as the 1939 income the amount of $38,657.61, that is, the remainder, without making use of the $44,590.92 reserve of June 30, 1938, and included as a loss the amount of $50,048.07 above referred to. The Treasurer did not accept the $38,657.61 income nor the $50,048.07 loss and, consequently, petitioner's income was increased in the amount of the difference, to wit, by $11,390.46.

In deciding the question raised by the taxpayer and rejecting its contention that it had suffered the aforesaid loss, the Tax Court based itself exclusively on the fact that

petitioner did not prove that the 75¢ it estimated for shipping and marketing expenses were an actual fact and stated:

"We refuse to believe that on the date of the hearing, approximately ten years later, plaintiff did not have evidence of the exact amount it spent in the selling and shipping of this sugar which would have enabled us to determine whether in fact the so-called net value of said sugar on June 30, 1939, was $6 or a higher or lesser amount. Such evidence, however, was not presented by the plaintiff and, as already noted, this Court is not prone to decide tax cases based on doctrines, inferences or accounting systems not supported by evidence on actual facts."

From an examination of the evidence we are convinced that the error assigned was not committed.

With the corresponding modification as to the 1935 deficiency and the 1936 overpayment, the judgment will be affirmed.